UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARLOS REYNOLDS,

    Plaintiff,

v.                                                          Case No. 12-12561
                                                           Hon. Lawrence P. Zatkoff

MICHIGAN DEPARTMENT OF
CORRECTIONS,

    Defendant.
_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on January 15, 2014

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

This matter is before the Court on Defendant's Motion for Summary Judgment [dkt 17]. The motion has been fully briefed. The Court finds that the facts and legal arguments are adequately presented in the parties' papers such that the decision process would not be significantly aided by oral argument. Therefore, pursuant to E.D. Mich. L.R. 7.1(f)(2), it is hereby ORDERED that the motion be resolved on the briefs submitted. For the following reasons, Defendant's motion is GRANTED.

**II. BACKGROUND**

**A. FACTUAL BACKGROUND**

Plaintiff Carlos Reynolds ("Plaintiff") is an African-American male who works for Defendant Michigan Department of Corrections ("Defendant") as a Lieutenant. Plaintiff is currently stationed at Huron Valley Women's Detention Facility. Prior to that, Plaintiff was assigned to the Ryan Correction Facility ("RCF") in Detroit, Michigan. The instant case involves Plaintiff's employment at RCF.

Plaintiff began working at RCF in 1995 and ultimately rose to the rank of Lieutenant in 2005. Correction officers at RCF were designated to work one of three different shifts: 6:00 a.m. to 2:00 p.m. (Shift 1); 2:00 p.m. to 10:00 p.m. (Shift 2); or 10:00 p.m. to 6:00 a.m. (Shift 3). The crux of Plaintiff's discrimination lawsuit is that he was "disparately" subjected to multiple shift changes based on racial animus.[1]

Scott Nobles ("Nobles"), a Caucasian male, was Deputy Warden at RCF during the relevant time period involved here. Nobles' duties comprised, among other things, discretionary decisions as to staffing of the shift command at RCF. The shift command consisted of Lieutenants (*i.e.*, Plaintiff's title) and Captains. In or around June 2010, Nobles decided to reassign Plaintiff from Shift 3 to Shift 2. Concurrent with the decision to reassign Plaintiff, Nobles also reassigned other shift command staff members to different shifts—these members included African Americans and Caucasians. Nobles testified that these changes were employed to "ensure a higher quality of shift supervision at [RCF]." Plaintiff disputes this, claiming instead that Nobles targeted Plaintiff because of his race.

Shortly after Plaintiff was notified of his shift change, but before the change was effectuated, Plaintiff informed Nobles that his father was ill and that he wished to remain on Shift 3. Plaintiff's request was granted, and he was permitted to temporarily maintain his official assignment on Shift 3. Plaintiff was officially reassigned to Shift 2 on September 6, 2011.

**B. PROCEDURAL BACKGROUND**

Plaintiff filed his complaint against Defendant on June 13, 2012. In his complaint, Plaintiff pleads the following claim: race discrimination in violation of Title VII of the Civil Rights Act of 1964. On February 28, 2013, Defendant filed a motion for partial dismissal of all portions of Plaintiff's complaint which encompassed involuntary shift changes that were not administratively exhausted. On

---

[1] It appears Plaintiff is somewhat confused as to how many shift changes he underwent. Plaintiff's complaint alleges that he experienced "8 separate shift changes since 2005," *see* Dkt. # 1, ¶ 8, while his response brief claims that number is eighteen, *see* Dkt. # 18, pp. 1–2.

2

March 20, 2013, the parties stipulated to dismiss all claims of discriminatory shift changes with exception of the shift change that occurred on September 6, 2011.

Defendant now moves the Court for an order granting summary judgment in its favor with respect to the remaining shift change.

### III. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[T]he plain language of Rule 56[] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). A party must support its assertions by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The moving party bears the initial burden of demonstrating the absence of any genuine dispute as to a material fact, and all inferences should be made in favor of the nonmoving party. *Celotex*, 477 U.S. at 323. The moving party discharges its burden by "'showing'–that is, pointing out to the district court– that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 325)).

3

Once the moving party has met its initial burden, the burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "[T]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## IV. ANALYSIS

Defendant challenges Plaintiff's employment discrimination claim on three grounds: (1) that Plaintiff cannot establish the September 6, 2011, shift change constituted an adverse employment action;[2] (2) that Plaintiff was treated no differently than similarly situated employees; and (3) that Defendant's action was legitimate and non-discriminatory, and not pretextual in nature.  In response, Plaintiff alleges there is no dispute that he was subjected to an adverse employment action, received different treatment as compared to similarly situated Caucasian employees, and that Defendant's offered explanations for the shift change were a pretext for discriminatory animus.  For the following reasons, the Court will grant Defendant's motion as Plaintiff fails to offer evidence sufficient to withstand summary judgment.

### A. TITLE VII DISCRIMINATION CLAIMS

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privilege of employment, because of such individual's race . . . ."  42 U.S.C. § 2000e–2(a)(1).  When asserting a disparate treatment claim, a plaintiff must prove discriminatory motive or intent for a particular adverse employment decision. *Huguley v. Gen. Motors Corp.*, 52 F.3d 1364, 1371 (6th Cir. 1995).  A plaintiff can make his showing of discriminatory intent for disparate treatment claims either through direct or circumstantial evidence. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–12 (2002).

---

[2] This shift change serves as the "adverse employment action" underpinning Plaintiff's claim of employment discrimination.

4

When the plaintiff seeks to establish discrimination on the basis of circumstantial evidence—as is the case here—the *McDonnell Douglas* burden-shifting framework applies. *Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 321 (6th Cir. 2012) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973) and *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 259 (1981)). A plaintiff must first establish a *prima facie* case under this framework by showing that he: (1) is a member of a protected class; (2) was qualified for the job; (3) suffered an adverse employment decision; and (4) was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. *Serrano v. Cintas Corp.*, 699 F.3d 884, 892–93 (6th Cir. 2012) (citing *White v. Baxter Healthcare Grp.*, 533 F.3d 281, 391–93 (6th Cir. 2008)).

Once the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the employer to offer a legitimate, non-discriminatory reason for its action. *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 810 (6th Cir. 1999). If the employer provides a legitimate, non-discriminatory reason, the burden shifts back to the employee to show that the employer's proffered reason is pretextual. *Id.* In order to rebut a defendant's proffered reasons as mere pretext, a plaintiff must establish that the proffered reasons either: (1) had no basis in fact; (2) did not actually motivate the challenged decision; or (3) were insufficient to motivate the challenged decision. *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008) (emphasis omitted).

### i. ADVERSE EMPLOYMENT ACTION

An adverse employment action has been defined as "a materially adverse change in the terms and conditions of [a plaintiff's] employment." *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 795 (6th Cir. 2004) (en banc) (citation omitted). A "bruised ego" or a "mere inconvenience or an alteration of job responsibilities" is not sufficient to constitute an adverse employment action. *Id.* at 797. Adverse employment actions are generally marked by a "significant change in employment status," including

"hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 798 (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)).

In the Sixth Circuit, an adverse employment action usually "inflicts direct economic harm" on the plaintiff, *White*, 364 F.3d at 789 (citation omitted), and "reassignments without salary or work hour changes do not ordinarily constitute adverse employments decisions in employment discrimination claims," *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) (citation omitted).[3] "[E]ven if a reassignment is not paired with a salary or work-hour change, it can nonetheless be considered an adverse employment action where there is evidence that the employee received a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010).

Plaintiff argues that the September 6, 2011, shift change constitutes an adverse employment action when reviewed in the context of all the circumstances (*i.e.*, the fluxes in Plaintiff's official shift assignment occurring before that date). All of these changes allegedly made it onerous for Plaintiff to plan family vacations and perform work as a part-time home improvement contractor.

Defendant first responds that Plaintiff fails as a matter of law to offer any evidence establishing that the only actionable shift change here—September 6, 2011—was truly "adverse." Next, Defendant theorizes that the "collective impact" of Plaintiff's shift changes fails to demonstrate "materially adverse" consequences in relation to the terms and conditions of his employment. And, in any event, Plaintiff's claim sounds in discrimination—not retaliation—and therefore requires Plaintiff to prove Defendant's actions negatively affected his employment or conditions of the workplace.

---

[3] It is unclear from the *Kocsis* decision what the term "work hour changes" refers to. In one instance, the term could be used to describe an overall reduction in the number of hours an employee works. Quite differently, though, the term could refer to an alteration in the time of day of an employee's shift. Regardless of those separate interpretations, the Sixth Circuit has repeatedly called for a *material* change in work conditions. *See, e.g.*, *Kocsis*, 97 F.3d at 885.

6

After viewing the evidence in a light most favorable to Plaintiff, the Court fails to find that Plaintiff suffered an adverse employment action. As recounted above, the actionable shift change here is Plaintiff's reassignment from Shift 3 (10:00 p.m. to 6:00 a.m.) to Shift 2 (2:00 p.m. to 10:00 p.m.), which occurred on September 6, 2011. Plaintiff offers no evidence that this shift transfer resulted in a demotion, a salary reduction, an alteration to benefits, an appreciable change in job responsibilities, or unpleasant working conditions. Rather, Plaintiff's discontent with the change to Shift 2 only reflects a "mere inconvenience" and not a "significant change in [his] employment status." *See White*, 364 F.3d at 797–98.

Nor is the result any different when looking "collectively" at the number of shift changes Plaintiff experienced since 2005. First, while Plaintiff argues that he encountered trouble "planning vacations" for him and his wife, he testified during his deposition that his annual leave—used for vacations—was in no way dependent on what shift he was assigned to. In other words, these changes in shifts merely posed as an "inconvenience" to scheduling vacations and therefore cannot constitute adverse employment actions for Plaintiff's discrimination claim. *See White*, 364 F.3d 797.

Moreover, Plaintiff's argument regarding his inability to perform part-time home improvement jobs fairs no better. Plaintiff admitted that no certain shift was more advantageous for his home improvement business. In fact, according to his testimony, Plaintiff would typically engage in his home improvement work in the morning, regardless of whether he was assigned to Shift 2 or Shift 3:

> Q. When do you usually do the jobs?
>
> A. Well, when I was on the ten to six shift I did the jobs in the morning when I got off work. When I was on the two to ten shift I would do the jobs in the morning before I went to work.
>
> Q. So you always -- you typically did the jobs during the morning?
>
> A. Right.

7

> Q. And the only time you worked the six to two shift or the first shift was that period in '05 and '06, correct?
>
> A. Yes.
>
> Q. All the other times you were doing second and third shift?
>
> A. Yes.

Dkt. # 17, Ex. B, p. 8. Thus, it appears that the "collective" changes in Plaintiff's shifts (between Shift 2 and Shift 3) had no impact whatsoever on his ability to function as a part-time home improvement contractor. This conclusion is further bolstered by the fact that Plaintiff is claiming no economic losses. *See id.* at p. 12. As such, the fluctuations in Plaintiff's shifts since 2005 are nothing more than mere inconveniences and did not cause "a materially adverse change in the terms and conditions of [his] employment." *White*, 364 F.3d at 795.

Perhaps most fatal to Plaintiff's claim is his failure to allege—much less prove—significant impact on his *employment* status. The Supreme Court has opined that the language sounding from Title VII's core antidiscrimination provision was purposefully drafted: "The italicized words in the substantive provision—"hire," "discharge," "compensation, terms, conditions, or privileges of employment," "employment opportunities," and "status as an employee"—*explicitly limit the scope of that provision to actions that affect employment or alter the conditions of the workplace.* No such limiting words appear in the antiretaliation provision." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S 53, 62 (2006) (emphasis added). Notably, all of Plaintiff's alleged undesirable consequences stemming from the shift changes relate to purported "harm" occurring outside of the employment context. These undesirable consequences, as the Supreme Court has clarified, would be more appropriately brought as an employment retaliation claim—not a Title VII discrimination action.

In the end, the Court concludes that no jury could reasonably find that Plaintiff was subjected to an adverse employment action. Because Plaintiff failed to prove a *prima facie* case of discrimination

8

under Title VII, the Court need not consider whether or not Defendant has provided legitimate, non-discriminatory reasons for its actions and whether such reasons were pretextual. The Court therefore grants summary judgment in favor of Defendant on Plaintiff's discrimination claim.

## V. CONCLUSION

Accordingly, for the reasons stated above, IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment [dkt 17] is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's Complaint [dkt 1] is DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

Date:  January 15, 2014                                s/Lawrence P. Zatkoff
                                                       Hon. Lawrence P. Zatkoff
                                                       U.S. District Judge